# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

SHANON RECTOR, )
)
      Plaintiff, )
)
vs. ) Case No. 09-CV-718-TLW
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
      Defendant. )

## OPINION AND ORDER

Plaintiff Shanon Rector seeks judicial review of a decision of the Commissioner of the Social Security Administration denying her claim for disability insurance and supplemental security income ("SSI") benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3)(A). In accordance with 28 U.S.C. § 636 (c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. [Dkt. # 12].

Plaintiff's applications for disability benefits were filed on January 18, 2007, alleging an onset date of January 1, 2005. [R. 122]. Plaintiff later amended her onset date to July 1, 2006. [R. 27]. The Administrative Law Judge ("ALJ") held a hearing on October 9, 2008. [R. 23]. On March 10, 2009, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the SSA. [R. 10]. The Appeals Council denied review on September 11, 2009. [R. 1]. The decision of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481. On November 4, 2009, plaintiff filed the subject action with this Court. [Dkt. # 1].

The role of the Court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is only to determine whether substantial evidence supports that decision and whether the applicable

legal standards were applied correctly. See Briggs ex. rel. Briggs v. Massanari, 248 F.3d 1235, 1237 (10th Cir. 2001). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. Casias v. Secretary of Health & Human Service, 933 F.2d 799, 800 (10th Cir. 1991).

## **Background**

Plaintiff was born on October 17, 1976, and was 31 years old on the date of the hearing before the ALJ. [R. 29]. She is 5'6" tall and weighs 190 pounds. [R. 30]. Plaintiff completed the eleventh grade and then obtained a GED. [R. 31]. She attended Oklahoma State University in Okmulgee from 2002 until 2005, and completed courses to become a certified habilitation training specialist ("HTS"). [R. 226, 352]. She also completed a one-year computer training program at Central Tech in Sapulpa. [R. 226]. Plaintiff has been married and divorced twice and has two children, ages 9 and 14 years old. [R. 30, 227]. She has a work history in HTS, in cleaning new houses, as an assistant manger of Sonic, a laborer at a glass company and a veterinary assistant/kennel helper. [R. 226]. Her most recent employment was in 2006, as a babysitter, working 30 hours a week earning an annual income of $8,500.00. [R. 32]. Plaintiff also has a felony conviction for grand larceny. [R. 238].

Plaintiff alleges she is unable to work due to bipolar disorder, panic attacks, anxiety, depression, carpal tunnel, back pain, and fibromyalgia. [R. 35]. The ALJ conducted a *de novo* hearing and applied the 5-step sequential evaluation process in his decision to arrive at his

determination that plaintiff is not disabled.[1] [R. 10-22]. The ALJ found: at step one, plaintiff has not engaged in substantial gainful activity since her alleged onset date [R. 12]; at step two, her severe impairments are problems with her hands, wrists, back, shortness of breath, vision, knees, fibromyalgia, depression, anxiety, bipolar disorder, personality disorder, and post-traumatic stress disorder, id.; at step three, none of the impairments or combination of impairments met or equaled any of the listed impairments in 20 C.F.R Pt. 404, Subpt. P, App. 1 [R. 13]; at step four, her residual functional capacity ("RFC") did not allow her to return to her past work, [R. 20]; and, at step five, she was not disabled because she could perform other jobs, such as semi-conductor assembler and clerical mailer, and that such jobs exist in significant numbers in the regional and national economy. [R. 21-22]. As part of his findings, the ALJ determined that plaintiff retained the RFC to perform sedentary work but she "is limited in her ability to feel and is slightly limited in her ability to finger and grip. She requires low noise environments and should avoid fine vision and cold and damp environments. Additionally, the claimant is able to perform simple, repetitive and routine tasks and is limited in reference to contact with the general public, co-workers and supervisors." [R. 14].

## Discussion

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C.§ 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). The term "disability" is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. A claimant is

---

[1] Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing the five steps in detail).

determined to be disabled only if she is unable to do her previous work; and considering her age, education, and work experience, cannot perform any other kind of work in the regional or national economy. 42 U.S.C. § 423(d). To meet this burden plaintiff must provide medical evidence of an impairment and the severity of an impairment during the time of her alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). Disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

Plaintiff raises three issues on appeal.

(1) The ALJ failed to perform a proper evaluation of the medical source evidence and opinions.

(2) The ALJ failed to perform a proper determination at step 5 of the sequential evaluation process.

(3) The ALJ failed to perform a proper credibility determination.

[Dkt. # 22 at 1, 3 and 4].

Plaintiff advances several arguments in support of her first issue on appeal. Initially, she contends the global assessment function ("GAF")[2] score of 50, made by David Parker, a licensed

---

[2] A GAF score is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning. Generally, a GAF score of 41-50 indicates "serious symptoms or a serious impairment in social, occupational, or school functioning." Id. See also American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000).

clinician at the Associated Centers for Therapy ("ACT") on January 12, 2007, should be considered a medical source opinion from her treating physician, evaluated as such, and assigned controlling weight.³ Alternatively, if not controlling weight, Mr. Parker's GAF score assessment should be entitled to deference and evaluated under the factors set froth in SSR 96-2p.⁴ The Court disagrees. Mr. Parker is not a licensed physician, therefore, his assessment is not entitled to be evaluated as a treating physician's opinion. Under the regulations, in assessing the limitations caused by an alleged disability, the ALJ must consider all of the available evidence in the individual's case record. This includes "acceptable medical sources" and "other sources." "Acceptable medical sources" includes licensed physicians, psychologists, optometrists, podiatrists and speech-language pathologists. See 20 CFR §§ 404.1502 and 416.902. "Other sources" not considered "acceptable medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. See 20 CFR §§ 404.1513(d) and 416.913(d). The ALJ may rely only on "acceptable medical sources" for the following purposes: (1) to establish the

---

³ When considering a treating source opinion, an ALJ must first determine if the opinion is entitled to controlling weight. See Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). In making this determination, an ALJ must consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether the opinion is consistent with other substantial evidence in the record. Id. If the ALJ determines that the opinion is deficient in both of these respects, then it is not entitled to controlling weight. Id. The ALJ's next step is to determine what weight, if any, the opinion deserves, considering certain factors identified in the regulations. See id. at 1300-01. Treating physician opinions are still entitled to deference and the ALJ must give good reasons in his decision for the weight he ultimately assigns to a treating physician's opinions. Id.

⁴ Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

5

existence of a medically determinable impairment, 20 CFR §§ 404.1513(a) and 416.913(a); (2) for a medical opinion, 20 §§ CFR 404.1527(a)(2) and 416.927(a)(2); and (3) as treating sources whose medical opinions may be entitled to controlling weight. 20 CFR §§ 404.1527(d) and 416.927(d). The ALJ may use evidence from "other sources" only to show the severity of the individual's impairments and how those impairments affect the individual's ability to function. In other words, information from "other sources" cannot be used to determine an impairment, provide an opinion, or be the controlling source. SSR 06-03p. Mr. Parker is a licensed professional councilor ("LPC") and a licensed alcohol and drug counselor ("LADC"). As such, Mr. Parker's assessment is considered as "other source" evidence and would not be entitled to controlling weight nor subject to evaluation as a treating physician's opinion.

Next, plaintiff contends that the ALJ could not ignore a GAF score of 50, regardless of its origin. Plaintiff relies on the testimony of the vocational expert who described a person with a GAF score of 50, as being able to obtain a job, but being unable to retain it. [R. 67]. The Court finds no error in the ALJ's failure to address plaintiff's GAF score of 50 in his RFC assessment, because the ALJ did take into consideration medical evidence of plaintiff's physical and psychological evaluation, which are similar to those used to arrive at a GAF score. The ALJ cited medical evidence in the record to support his RFC evaluation. The ALJ further explained why he discounted other evidence in the record which supported her claim. Specifically, the ALJ relied on a medical report and psychological evaluation prepared by Janet Dean, MS on January 17, 2007.[5] Test results

---

[5] The ALJ mistakenly attributed this evaluation to Emil Milo, M.D. because of a scriber's error of mis-identity in the Transcript Index. This error does not invalidate the ALJ's assessment of this evidence because the ALJ does not assign any greater weight to the analysis because of his misconception that it was made by a physician rather than a licensed clinician. The ALJ instead relied on the results of the medically acceptable tests performed by the clinician.

showed that plaintiff functioned in the average range intellectually. Ms. Dean acknowledged that plaintiff reported a history of numerous emotional problems, but stated these allegations could not be verified, due to several of the tests being invalidated, based on her assessment that plaintiff presented herself as far more emotionally impaired then could be verified by observation. Ms. Dean stated plaintiff's mood disorder could be a bipolar disorder or a cyclothymic disorder. Her depression and anxiety could be situational (as a result of her marital problems), part of her bipolar disorder or major depression, post traumatic stress disorder, or panic disorder. Ms. Dean believed plaintiff's alleged history of extreme anger, extreme health problems and physical limitations could not be explained by documented health problems and physical limitations and that these conditions should be further investigated. Ms. Dean believed that plaintiff's history and test results appeared to be consistent with a personality disorder, with strong borderline, paranoid and schizotypal features. She concluded plaintiff has a mood disorder, depressive disorder, anxiety disorder, cognitive disorder, learning disorder, marital problems and personality disorder. [R. 16]. Ms. Dean suggested that plaintiff would be more suitable for employment related to objects, rather than people. She also recommended afternoon or evening work shifts, rather than mornings, to accommodate plaintiff's sleep patterns. [R. 16]. Ms. Dean's report was based on results she obtained from conducting numerous standardized tests and procedures to determine intellectual functioning, language and achievement abilities, and psychological and emotional functioning.[6] [R. 226]. The Court notes that Ms. Dean recommended that accommodation be made for plaintiff's employment,

---

[6] Plaintiff was referred to Ms. Dean by the ACT [R. 242] to assist the VR Specialist in determining plaintiff's ability for rehabilitation services or other appropriate services. She was referred for a comprehensive psychological evaluation, including possible depression and "ADD." Ms. Dean administered: Clinical Interview, WAIS-III, WRAT4, BAI, BDI-II, CPT-11, ADSA, CAARS-S:L, TSI, MCMII-III, MMPI-2 and Stress Questionnaire. [R. 226].

rather than any suggestion that plaintiff was incapable of rehabilitation or employment. [R. 226-234]. As shown below, ACT referred plaintiff to Ms. Dean to provide a clinical rehabilitation assessment to aid in the formation of a treatment plan. [R. 242]. Thus, the treating team at ACT was not relying on the GAF score of 50 provided by its in-house clinician Mr. Parker in evaluating plaintiff's treatment or medication plan.

Plaintiff presented herself for evaluation and treatment at ACT on eight separate occasions from January 12, 2007 through March 29, 2007. [R. 269-287]. The clinical team's initial evaluation was mood disorder, probable bipolar disorder and probable post traumatic stress disorder. Scott Hanan, M.D. prescribed plaintiff a trial sample of Lamictal and Cymbalta. [R. 16]. On her last visit, the ALJ noted a report that plaintiff "appeared distraught" complaining that the 16 year old girl she was taking care of, and seeking guardianship of, was using drugs again which was affecting plaintiff's children. Dr. Scott Hanan discontinued her prescription for Cymbalta, because it was making her sick and increased her dosage of Lamictal. He recommended that plaintiff return in six weeks for further evaluation. On her last visit, Dr. Hanan observed that plaintiff's mood swings remained fairly stable, but she still had racing thoughts that prevented sleep, some depression and residual irritability. The Court notes, the target date for completion of plaintiff's therapy and medication management at the ACT was set for September, 2007. [R.274]. However, the record indicates plaintiff's last appearance at ACT was on March 29, 2007. [R. 269]. At the hearing, plaintiff testified that she stopped going to ACT because the clinicians would not listen to her, would not provide therapy, or help her. "They just kept prescribing me medications." [R. 50]. Plaintiff's allegations are not supported by the evidence. Her medical records show that treatment objectives

8

were scheduled for her but that plaintiff failed to return and follow through with treatment.[7]

The ALJ considered a psychological evaluation performed on November 26, 2008, by agency consultant Minor Gordon, PhD. Dr. Gordon found plaintiff's mood was affected by anger, depression and sleep disturbance. [R. 18]. He found her social behavior to be within normal limits. [R. 18]. His assessment focused on plaintiff's dependent personality. The ALJ relied on Dr. Gordon's opinion that "plaintiff has a strong tendency to depend on others to do things for her that she should be able to do for herself." [R. 18]. Dr. Gordon opined that plaintiff has "situational anxiety and depression, secondary to unmet dependency needs, dependent personality traits, spelling disorder, and arithmetic disorder, with a GAF of 70." [R. 18]. In reference to work activity, "Dr. Gordon stated the claimant could be expected to perform some type of routine repetitive task and he further stated she would be able to relate adequately with co-workers on a superficial basis for work purposes." [R. 18]. The Court notes that Dr. Gordon recommended accommodations be made for plaintiff's employability but he made no suggestion that plaintiff was incapable of employment.

Thus, the Court finds the ALJ made accommodations and limitations in his RFC determination as to plaintiff's mental status which were consistent with the record. The Tenth Circuit has stated that, "a low GAF score does not alone determine disability, but it is instead a piece of evidence to be considered with the rest of the record." Petree v. Astrue, 260 Fed.Appx. at 42 (citing Howard v. Comm'r of Soc.Sec., 276 F.3d 235, 241 (6th Cir. 2002)) ("While a GAF score may

---

[7] On March 21, 2007, clinician Rachel Obadiah was scheduled to provide monthly stress management techniques, relaxation techniques, and exercises that would not harm her back. [R. 274]. On March 28, 2007 plaintiff was scheduled for 12 psychotherapy sessions and 6 case management session per month, from that date until September 28, 2007. [R. 269].

be considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.").[8] Mr. Parker, the clinician who rated plaintiff's GAF score of 50, appears to have made this assessment based on his interview with plaintiff and her subjective expressions. Mr. Parker does did not indicate that plaintiff could not work. [R. 117-119]. Because a GAF score of 50 may not relate to plaintiff's ability to work, the score, standing alone without further explanation, "does not establish an impairment severely interfering with an ability to perform basic work activities." Eden v. Barnhart, 109 Fed.Appx. 311, 314 (10th Cir. 2004) (unpublished) (a GAF score of 50, standing alone, without further explanation, does not establish an inability to perform basic work activities.)

Next, plaintiff contends the ALJ erred in not assigning a weight to opinions of the clinicians and agency consultative examiners who performed mental evaluations. Plaintiff contends the ALJ erred in not weighing the evidence and explaining what weight he assigned to each. The Court finds no merit in this argument. The presence of an opinion by a treating physician triggers the analysis under Watkins, 350 F.3d at 1300. Dr. Hanan was plaintiff's mental health specialist, but he did not provide an opinion as to plaintiff's GAF score. The ALJ summarized each of the "other source opinion" evidence and incorporated the mental limitations involved in each of their evaluations into his RFC determination. Thus, the Court finds the ALJ's mental RFC assessment is supported by substantial evidence, and the ALJ applied the correct legal standards.

Additionally, plaintiff contends the ALJ ignored the opinion of agency consultant Sally Varghese, M.D. that plaintiff had "moderate" limitation in her performance of daily living activities and, instead, provided his own analysis to determine plaintiff had "mild" limitations in daily living

---

[8] A GAF score is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000).

activities without explaining how he came to this conclusion. To the contrary, the ALJ did provide evidentiary support for his determination that plaintiff had mild limitations in her ability to perform daily living activities. The ALJ reviewed the activities that plaintiff admittedly performed and relied on objective medical evidence:

> By the claimant's own admission, she is able to care for her own children, as well as help care for a 'friend's daughter,' she is able to cook, dust, wash laundry, watch television, drive and visit. However, within the next statement, the claimant then testified that she 'naps 70-80 percent of the day,' with [sic] is inconsistent with the previously noted activities that the claimant readily admits she is able to perform. Also, when seen by Dr. Milo on January 17, 2007, he stated the claimant reported extreme health problems and physical limitations, however, he stated they are 'not explained by documented health problems and physical limitations. (Exhibit 2F).

[R. 20]. Moreover, although the ALJ did not adopt Dr. Varghese moderate limitation assessment in his decision, he did adopt her ultimate opinion as to plaintiff's functional capacity assessment:

> Claimant can perform simple and some complex tasks. Claimant can relate to others on a superficial work basis. Claimant can adapt to a work situation.

[R. 259]. Dr. Varghese's opinion was consistent with the other medical source evidence that plaintiff was capable of working, with limitations imposed.

Plaintiff contends the ALJ erred in ignoring Dr. Milo's December 29, 2006 evaluation of plaintiff's back. Dr. Milo opined:

> Regarding her low back, she has a moderate amount of paraspinal muscle spasms in it. She has normal muscle strength. However, on sensory examination, she expressed dull sensation over the lateral aspect of the left thigh, as well as calf. X-rays of the lumbosacral spine show <u>minimal</u> degenerative disk disease, L4-5 and L5-S1, otherwise negative.

[R. 225] (emphasis added). Dr. Milo recommended that plaintiff be retrained for something lighter and more sedentary, considering she has a problem with both upper as well as lower extremities, as well as her back. Again, Dr. Milo did not opine that plaintiff was incapable of working, rather he

11

recommended that accommodation be made due to her complaints. Dr. Milo's opinion is supported by the x-rays he relied on which show only "minimal degenerative disk disease, L4-5 and L5-S1, otherwise negative." [R. 225]. The ALJ's RFC is restricted to unskilled sedentary work as recommended by Dr. Milo.[9] The ALJ further limited plaintiff's sedentary work to "occasionally climb, bend, stoop, squat, kneel, crouch, crawl, operate foot controls, and reach overhead." [R. 14]. There is no error in the ALJ's findings on this issue.

As her second assignment of error, plaintiff contends the ALJ failed to perform a proper determination at step 5 of the sequential evaluation, because he reduced the number of jobs available as a semiconductor assembler based on fine vision and fingering limitations but did not correspondingly reduced the number of jobs available as a clerical mailer because of fine vision and fingering limitations. The Court finds that this argument has no merit. In response to the ALJ's first hypothetical question, the vocational expert testified that there were 6,000 jobs regionally and 65,000 nationally for semiconductor assembler, and 5,000 jobs regionally and 80,000 nationally for clerical mailer. In his second hypothetical question, the ALJ eliminated jobs requiring fine vision such as doing small tedious tasks with the eyes. He also limited her ability to feel to only a "slight limitation

---

[9] The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.
SSR 96-9p

in finger and grip." [R. 63]. He clarified by saying: "she shouldn't be doing small, tedious tasks with them like pin and clip fastening, nuts and bolts, and her job should not entail tacticle uses." [R. 63]. The vocational expert testified that with these additional restrictions, the number of semiconductor assembler jobs available would be reduced by one-half, but these restrictions would not reduce the number of jobs available for clerical mailer. Plaintiff attaches a copy of the DOT description for each job. It is clear from a review of the DOT, that work in the area of semiconductor assembler can be performed by using tweezers, or by using chemical solution, or by breaking equipment to perform the job. By reducing the available jobs by one-half, the vocational expert eliminated those jobs involving the use of small tedious tasks with the eyes and tacticle use of the hands. Although the ALJ imposed the same restrictions on clerical mailer, he narrowed clerical mailer to folding paper and picking up a pencil. The vocational expert limited the work of clerical mailer to addressing or inserting mailers. Plaintiff has failed to show that clerical mailer jobs would be correspondingly limited by plaintiff's fine vision and hand restrictions. Thus, the vocational expert's testimony does not conflict with the DOT as plaintiff alleges.

Plaintiff contends the vocational expert did not consider the ALJ's restriction that plaintiff would need to be able to briefly change positions in transition from sitting to standing during an 8-hour work shift. In his hypothetical question, the ALJ limited plaintiff to sedentary work to stand and walk 6- hours in an 8- hour day at a 30-minute interval; sit 6-hours in an 8- hour day at an hour interval. The ALJ clarified by adding: "I'm not saying they've got to sit for an hour and stand for 30 minutes, or vice versa, but they'll have to make brief positional changes at the end of those times." [R. 62]. The ALJ also clarified that plaintiff would be able to maintain production quotas. Id. In response, the vocational expert testified that one-half of the semiconductor assembler jobs

13

would be eliminated but that all the clerical mailer jobs would still be available to her. Thus, contrary to plaintiff's assertion, the vocational expert did narrow the number of jobs available based on the restrictions contained in the ALJ's second hypothetical.

Plaintiff contends the ALJ was required to produce evidence of a significant number of jobs in the state, rather than the national economy, involving semiconductor assemblers and clerical mailers, relying on the case of Trimiar v. Sullivan, 966 F.2d 1326 (10th Cir. 1992). However, subsequent case law does not support plaintiff's interpretation of Trimiar. In this instance, the vocational expert testified to the number of significant jobs available in both the regional and national economy. In Raymond v. Astrue, 356 Fed.Appx. 173 (10th Cir. 2009), the Court clarified its decision in Trimiar.

> Mr. Raymond cites Trimiar v. Sullivan, 966 F.2d 1326 (10th Cir. 1992), and argues that the ALJ should have engaged in a multi-factor analysis to assess whether there are significant jobs in the regional economy. But this is not what Triamiar requires. Like our other cases, the court in Trimiar indicated that the relevant test is either jobs in the regional economy or jobs in the national economy. Id. at 1330-32. In Trimiar the focus was on jobs in the regional economy because the vocational expert in that case testified only to the number of available jobs in the regional economy.

Id. (emphasis in text). Since the vocational expert testified to jobs available in both the regional and national economy, the holding in Trimiar does not apply to this case. See also Botello v. Astrue, 376 Fed. Appx. 847 (10th Cir. 2010) and Wendelin v. Astrue, 366 Fed. Appx. 899 (10th Cir. 2010). Thus, there is no merit to plaintiff's second issue on appeal.

As her final issue on appeal, plaintiff challenges the ALJ's credibility determination. Plaintiff contends the ALJ used boiler plate language in making his credibility determination, that he failed to support his findings with substantial evidence, he was selective in the evidence relied upon rather than considering the evidence as a whole, he did not demonstrate that her daily living

14

activities were factually inconsistent with her claimed limitations, and he relied upon his personal speculations. The Court disagrees.

The ALJ reviewed plaintiff's testimony, objective medical evidence, medical records by her treating sources, and the consultative evaluators, her activities of daily living, and found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with his RFC assessment. [R. 20]. In her brief, plaintiff details the ALJ's credibility findings utilizing more than five-pages of her ten-page brief in an attempt to show his findings were inadequate. To the contrary, as shown by plaintiff's coverage of this issue, the ALJ detailed the evidence he relied on and linked his credibility findings to the evidence of record. The ALJ relied on the results of acceptable standardized testing and the observations of the clinician who performed those tests. The clinician noted that plaintiff's allegations of emotional problems could not be verified due to several of the tests being invalidated, and the failure to be able to verify her claims by observation. [R. 15]. The clinician also noted that it is uncertain whether plaintiff's mental disorders, depression and anxiety were situational, related to her marital problems, or organic. [R. 15]. The clinician observed that plaintiff's allegation of extreme health problems and physical limitations, could not be explained by documented health problems. [R 16]. The clinician noted that plaintiff has never received treatment for an attention deficient disorder and that the tests she administered "appeared invalid." [R. 16]. He also noted that the clinician recommended that limitations be placed on plaintiff's employment conditions and retraining. [R. 16]. The ALJ cited the examination notes from ACT, observing plaintiff's efforts to get legal guardianship of a 16-year old family friend. He referenced her testimony that she is able

15

to care for her own two children, as well as help care for the "friend's daughter," is able to cook, dust, wash laundry, watch television, drive and visit. He then compared this testimony with her claim that she naps 70 to 80 percent of the day, and found her testimony inconsistent and not reliable. [R. 20]. He also found that her daily activities were inconsistent with her claimed limitations caused by her medical conditions. Id. He considered her description of pain and found her testimony to be "so extreme" as to appear implausible and not typical for the impairments documented by the medical evidence. Id. The ALJ focused on the consultant's notes at ACT in which plaintiff claimed she could not work because of "back problems." When she was recommended to a "low cost doctor" for treatment, plaintiff responded that she didn't like to sit around those places and declined the referral. Id. The ALJ found that if plaintiff had disabling pain as alleged, "it is reasonable to assume she would exhaust every means possible to obtain relief of the pain." Id.

An ALJ's credibility findings warrant particular deference because he is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion. White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2002). After comparing plaintiff's allegations to the objective evidence and other medical source assessments, the ALJ made a supported finding that plaintiff's subjective complaints lacked credibility. The fact finder makes credibility determinations, and his judgment will stand if supported by sufficient evidence. Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993). The failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment. See Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir.1990) (Secretary properly discounted claimant's alleged impairment due to poorly controlled seizures where claimant failed to follow prescribed treatment regime). The facts that plaintiff did not follow through with her treatment and

medication plan and refused to accept medical referrals are legitimate considerations in evaluating the validity her alleged impairment. Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1996) (The failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment). An ALJ may consider a claimant's failure to follow treatment aimed at relieving her symptoms when evaluating credibility. See 20 CFR §§ 404.1530, 416.930. (In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work. If you do not follow the prescribed treatment without good reason, we will not find you disabled.). Plaintiff is asking the Court to reweigh the evidence, something that the Court cannot do. Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005). Because the ALJ gave supported reasons for her credibility determination, the Court should uphold the ALJ's finding that plaintiff was not fully believable. Bean v. Charter, 77 F.3d 1210, 1213 (10th Cir. 1995).

## Conclusion

The Court finds that substantial evidence supports the Commissioner's decision and that the correct legal standards were applied. Accordingly, the Court AFFIRMS the decision of the Commissioner denying disability benefits to plaintiff.

SO ORDERED this 19th day of April, 2011.

T. Lane Wilson
United States Magistrate Judge